# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE, as Parent and Natural Guardian, on behalf of ADAM DOE, a Minor,<br><br>    <u>Plaintiff</u>,<br><br>  -v.-<br><br>DEER MOUNTAIN DAY CAMP, INC.; DEER MOUNTAIN BASKETBALL ACADEMY,<br><br>    <u>Defendants</u>. | Civil Action No. 07 Civ. 5495 (DCP) |

[Plaintiff's motion for summary judgment granted in part; Defendants' motion for summary judgment denied; Plaintiff's action for injunctive relief and Defendants' unclean hands defense dismissed.]

Dated: January 13, 2010

<u>Cleary Gottlieb Steen & Hamilton LLP</u> (<u>Lewis J. Liman</u>, <u>Jorge G. Tenreiro</u>, and <u>Scott G. Thompson</u>); <u>Legal Action Center</u> (<u>Sally Friedman</u> and <u>Renee D. Martinez</u>); <u>Legal Aid Society of Rockland County, Inc.</u> (<u>Howard D. Sherwin</u>) for the Plaintiff.

<u>Rubin, Hay & Gould, P.C.</u> (<u>Rodney E. Gould</u> and <u>Robert C. Mueller</u>) for the Defendants.

### OPINION & ORDER

  POGUE, Judge:[1] In this action, Plaintiff Adam Doe ("Plaintiff" or "Adam") claims that Defendants Deer Mountain Day Camp, Inc. ("DMDC") and Deer Mountain Basketball Academy ("DMBA") discriminated against him -- in denying him admission to a basketball camp -- on the basis of his disability, namely, his

---

[1] Judge Donald C. Pogue of the United States Court of International Trade, sitting by designation.

infection with the Human Immunodeficiency Virus ("HIV"), in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101-213 (2000) ("ADA")[2] and the New York State Human Rights Law, N.Y. Exec. Law §§ 290-301 (2004) ("NYHRL").

The court has jurisdiction over the ADA claims pursuant to 28 U.S.C. § 1331; it has supplemental jurisdiction over Plaintiff's state claims pursuant to 28 U.S.C. § 1367.

Presently before the court are both parties' motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. As will be explained further below, because Plaintiff's disability was a substantial factor in Defendants' denial of Adam's admission, and because Defendants failed to present any evidence of the objective reasonableness of their determination that Plaintiff's condition posed a threat to other campers, the court GRANTS, as to DMDC, Plaintiff's motion for declaratory relief. However, because the parties have not clarified the relationship between DMDC and DMBA, the court DENIES Plaintiff's motion as to DMBA at this time. In addition, because Plaintiff lacks standing to seek injunctive relief, the court DISMISSES Plaintiff's claim in that regard. The court also DENIES Defendants' motion in its entirety, and DISMISSES Defendants' affirmative defense of unclean hands.

---

[2] Unless otherwise indicated, all U.S. Code citations are to the 2000 edition.

## I. Background

The parties disagree as to some of the facts at issue here; therefore, the court will endeavor to fairly set forth the disputed and undisputed evidence, addressing in turn DMDC's and DMBA's admission process, Adam's background and application for admission to DMBA, and the relevant history of this litigation.

### A. Deer Mountain Day Camp

DMDC, a camp regulated by the American Camp Association as well as the Rockland County Department of Health, (Pl.'s Confidential Ex. C in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Ex. C"), Roberta Katz[3] Dep. 9, 11-12) accepts applications for admission from potential campers. This process requires that a potential camper pay an admission fee and submit a signed application, which includes both a "medical report" and a "camper medication form."[4] (Pl.'s Ex. C., Roberta Katz Dep. 13; Pl.'s Ex. E, [DMBA] 2004 Application 1-4.)[5]

---

[3] Sisters Roberta Katz and Carol Katz are DMDC owners and directors. (Pl.'s Ex. C, Roberta Katz Dep. 5, 6; Pl.'s Ex. D, Carol Katz Dep. 5.)

[4] The medication form is "a New York State form" and asks which medications, prescription and over the counter, a camper takes and how to administer them. (Pl.'s Ex. C., Roberta Katz Dep. 20.)

[5] The forms require signatures both from the child's parent and from the child's doctor. (Pl.'s Ex. C., Roberta Katz Dep. 17; Pl.'s Ex. E, [DMBA] 2004 Application 1-4.)

The forms are subsequently reviewed by camp nurses,[6] who are responsible for health assessments of the prospective campers. (Pl.'s Ex. C., Roberta Katz Dep. 13-14.) Often DMDC nurses require some time, prior to the start of camp, to look into prospective campers' medical conditions, as well as medications listed on a camper's form, in order to determine how to keep the camper safe and to allow the camp staff to anticipate medical problems the child might have. (Id. 13-14, 15-16, 23-25.) If one of the nurses has a question, he or she will usually speak with a parent and, with the parent's permission, with the doctor or a specialist. (Id.

---

[6] Ellen Gloskin is employed as a DMDC nurse. (Pl.'s Ex. C., Roberta Katz Dep. 27.) She conducts health training (Pl.'s Ex. D, Carol Katz Dep. 8) and develops and approves the "health care policies and procedures" which are approved by the camp's consulting doctor. (Pl.'s Ex. C., Roberta Katz Dep. 10.) Although she assesses the applicants' health and fitness for camp, and "decides, generally, whether a camper is medically fit to go to camp," she does not have the "final say" as to who can attend. (Pl.'s Ex. E, Ellen Gloskin Dep. 97.)

As a registered nurse, Gloskin is trained in CPR and RTE ("Responding to Emergencies"). (Id. 9.) She has experience with HIV and AIDS, and has conducted training for employers on universal precautions. (Id. 10-11.) Earlier in her career, Gloskin worked as a pediatric medical child program manager in a hospital. (Id. 9.) Based on her experience in this former job, Gloskin believes that patients can have stools with blood in it and blood may get on the toilet seat; this blood could potentially spread any number of diseases. (Id. 13-15.) Therefore, HIV-positive patients would use a separate bathroom. (Id. 14, 18.) Gloskin has provided household members information on the transmissibility of HIV, including proper cleaning and hygiene. (Id. 21-22.) However, Gloskin has never counseled a patient to use a different toilet from other family or household members. (Id. 22-23.)

41, 83-85; Pl.'s Ex. E, Ellen Gloskin 31, 37, 46.)[7]  DMDC will also
inquire into medications in order to determine potential side
effects as they relate to sun, exercise, and dehydration. (Id. 117-
18.)

Accordingly, DMDC needs to receive applications before camp
begins so as to have sufficient time to prepare camp facilities for
all campers' health needs. (Id. 37, 43-44.)  It is unclear whether
DMDC has a deadline for application submission, but DMDC does
require that a camper provide a signed application and medical
forms prior to the start of camp. (Id. 28-30, 37.)  Yet it has
happened that DMDC has accepted application forms on the first day
of camp. (See id. 31-35.)

While DMDC's application provides for the submission of
medical information, DMDC has no policy regarding assessment of a
child's health and has no medical or admission standards; up until
the events giving rise to this action, the camp had never denied
admission to a child because of a medical condition.[8]  (Id. 14, 15,
41; Pl.'s Ex. E, Ellen Gloskin 44-45.)

---

[7] Medical conditions that DMDC has researched in this process
include diabetes, asthma, mental health problems, allergies,
epilepsy or seizure disorders, lack of lungs or kidneys, and
ocular implants. (Pl.'s Ex. C., Roberta Katz Dep. 24, 39-40, 84.)

[8] Although no child has been denied admission, should a child
have a communicable disease like tuberculosis or the chicken pox,
DMDC would likely prevent the child from attending camp. (Pl.'s
Ex. E, Ellen Gloskin Dep. 47.)  DMDC has sent children home when
they have contracted these illnesses. (Pl.'s Ex. C., Roberta Katz
Dep. 46.)

At the same time, the camp uses "universal precautions,"[9] and,

at orientation, prior to the summer months, the staff has training

thereon. (Pl.'s Ex. C., Roberta Katz Dep. 107; Pl.'s Ex. E, Ellen

Gloskin Dep. 26-27; Pl.'s Ex. D, Carol Katz Dep. 30.)   Further,

---

[9] The Centers for Disease Control and Prevention ("CDC")
define "universal precautions" as:

> a set of precautions designed to prevent transmission
> of [HIV], hepatitis B virus (HBV), and other bloodborne
> pathogens when providing first aid or health care.
> Under universal precautions, blood and certain body
> fluids of all patients are considered potentially
> infectious for HIV, HBV and other bloodborne pathogens.
> . . .
>
> Universal precautions apply to blood, other body
> fluids containing visible blood, semen, and vaginal
> secretions. Universal precautions also apply to tissues
> and to the following fluids: cerebrospinal, synovial,
> pleural, peritoneal, pericardial, and amniotic fluids.
> Universal precautions do not apply to feces, nasal
> secretions, sputum, sweat, tears, urine, and vomitus
> unless they contain visible blood. Universal
> precautions do not apply to saliva except when visibly
> contaminated with blood or in the dental setting where
> blood contamination of saliva is predictable.
>
> Universal precautions involve the use of
> protective barriers such as gloves, gowns, aprons,
> masks, or protective eyewear, which can reduce the risk
> of exposure of the health care worker's skin or mucous
> membranes to potentially infective materials. In
> addition, under universal precautions, it is
> recommended that all health care workers take
> precautions to prevent injuries caused by needles,
> scalpels, and other sharp instruments or devices.

Centers for Disease Control and Prevention, U.S. Department of
Health and Human Services, Universal Precautions for Prevention
of Transmission of HIV and Other Bloodborne Infections (1996)
http://www.cdc.gov/ncidod/dhqp/bp_universal_precautions.html.
(See also Pl.'s Ex. G, David Levy Dep. 42-43.)

DMDC keeps its swimming pool properly chlorinated. (Pl.'s Ex. E, Ellen Gloskin Dep. 88-89.) But, during the time at issue here, the camp had no particular policies in place for HIV-positive children. (Pl.'s Ex. C., Roberta Katz Dep. 116.)

If "major" medical situations occur or when DMDC nurses have further questions or concerns during their review of applications for admission, DMDC consults Dr. William Bernstein,[10] a local pediatrician who voluntarily offers the camp medical advice and information. (Pl.'s Ex. E, Ellen Gloskin Dep. 27-29; Pl.'s Ex. F, William Bernstein Dep. 9-10.)[11] In this role, and when providing information to DMDC regarding certain of his patients wishing to attend the camp, Bernstein may inform DMDC and the camper's family that he or she should not attend camp for medical reasons, and has recommended restrictions for children with certain disabilities or diseases. (Id. 37-38.) On medical forms submitted for his patients, Bernstein will discuss the child's medical fitness to attend camp and potential side effects of medications that the child takes. (Id. 38-39.) However, Bernstein had never, prior to

---

[10] Bernstein has practiced pediatric medicine for over 41 years and is the main owner of and practices at the New City Pediatric Group ("NCPG"). (Pl.'s Ex. F, William Bernstein Dep. 7.) Bernstein has treated HIV-positive children and usually consults with their specialists. (Id. 15-16, 18.) He has taken extra courses on HIV but, by his own admission, has no special HIV training. (Id. 16.)

[11] Bernstein has volunteered his time for three camps for over 30 years. (Pl.'s Ex. F, William Bernstein Dep. 9-10.)

the events leading up to this lawsuit, called DMDC directly to report information on a child. (Pl.'s Ex. C., Roberta Katz Dep. 75.)

## B. Deer Mountain Basketball Camp

Although DMBA took place at the DMDC facility, DMDC claims that it did not operate DMBA. (Id. 16-17.) Rather, Steve Loscher, DMBA director, worked as an "outside contractor." (Id. 53.) For the most part, Loscher's staff ran the basketball camp, but DMDC oversaw the DMBA applications process and provided health care personnel such as the lifeguard and nurses. (Pl.'s Ex. D, Carol Katz Dep. 11, 12; Pl.'s Ex. C, Roberta Katz Dep. 19.)

The application process for DMBA was identical to that of DMDC; DMBA used the DMDC medical report and medication form, and the potential attendees of DMBA were required to submit these forms to the DMDC offices. (Pl.'s Ex. C., Roberta Katz Dep. 19, 25. See also Pl.'s Ex. E, [DMBA] 2004 Application 1-3.) In addition, Nurse Gloskin reviewed these forms at DMDC prior to the start of DMBA. (Pl.'s Ex. E, Ellen Gloskin Dep. 56-57.)

## C. Jane Doe[12] and Adam Doe

Adam contracted HIV at birth due to perinatal infection. (See id.) Adam takes antiretroviral medications to treat his condition, and his syndrome has been undetectable for years. (Id. 54.) On the

---

[12] Jane Doe and her husband adopted Adam when he was a baby. (Pl.'s Ex. H, Jane Doe Dep. 7.)

advice of Dr. Neu, Adam's HIV specialist, Adam and his mother had kept and continue to keep Adam's HIV-seropositivity[13] confidential and have not informed his school of his HIV medications. (Pl.'s Ex. H, Jane Doe Dep. 34; Neu Aff. ¶¶ 19-24.)

Adam likes to play basketball, (Defs.' Ex. 2 in Opp. to Pl.'s Mot. for Summ. J., Adam Doe Dep. 7; Pl.'s Ex. H, Jane Doe Dep. 50-51) and, in 2004, his HIV clinic recommended that he attend a basketball camp. (Pl.'s Ex. H, Jane Doe Dep. 50. See also Pl.'s Ex. A in Opp'n to Defs.' Mot. for Summ. J., Charlotte Revesz Dep. 25.)

Bernstein is Adam's primary pediatrician, although, from time to time, Adam has also seen Dr. David Levy.[14] (Pl.'s Ex. H, Jane Doe Dep. 41; Pl.'s Ex. G, David Levy Dep. 56-57.) However, Bernstein is not involved in Adam's HIV treatment, does not prescribe Adam's medications, and is not familiar with the drugs Adam uses or their potential side effects. (Pl.'s Ex. F, William Bernstein Dep. 69-70.) Whenever Adam visits the HIV clinic, Bernstein gets reports from Neu. (Id. 18.) Bernstein has spoken to Neu about, among other things, Adam's pneumonia, ear infections, and hospitalizations.

_____

[13] Individuals whose blood serum contains HIV-antibodies have HIV-seropositivity.

[14] Dr. Levy worked as a pediatrician at NCPG from August 2002 through March 2005. (Pl.'s Ex. G, David Levy Dep. 10.) He has been a member of the American Academy of Pediatrics since 1999. (Id. 14.) In addition, Levy saw patients with HIV at clinics while in medical school and as a resident. (Id. 20.) Adam was the only HIV patient Levy treated at NCPG, and Levy never consulted Adam's specialist. (Id. 20-21.)

(<u>Id.</u> 18-20.)[15]

## D. Adam's Application to DMBA

In June or July 2004, when Adam was approximately ten-years-old, Mrs. Doe met with Loscher to discuss signing Adam up to attend a summer basketball camp. (Pl.'s Ex. H, Jane Doe Dep. 21-22; Compl. ¶ 15.) After Mrs. Doe informed Loscher that Adam was HIV-positive, Loscher recommended that Adam attend DMBA as it would be medically supervised. (Pl.'s Ex. H, Jane Doe Dep. 21-23.) DMBA was to begin on August 23 of that year. (<u>See</u> Pl.'s Ex. E, Ellen Gloskin Dep. 62, 94; Defs.' Answers and Objections to Pl.'s First Set of Interrogs. ("Defs.' Answers"), Interrog. 11.)

Mrs. Doe testified that she "felt funny" when Loscher reacted to Adam's condition, (Pl.'s Ex. H, Jane Doe Dep. 29) but she paid the $345 admission fee, and Loscher mailed her the DMBA/DMDC

---

[15] There is some debate between the parties whether Adam had missed an earlier basketball camp, in the summer of 2004, due to illness. According to NCPG records, on June 8, 2004, almost two months before the start of DMBA, another NCPG doctor treated Adam for fever and sore throat associated with a streptococcus infection, and placed Adam on antibiotics for 10 days. (Pl.'s Ex. F, William Bernstein Dep. 72-73.) Further, Gloskin's notes recorded that Mrs. Doe had stated that Adam missed a prior basketball camp due to illness. (Pl.'s Ex. E, Ellen Gloskin Dep. 77-78; Pl.'s Ex. E, Ellen Gloskin Notes 2.)

However, Bernstein noted that he would have a record if Adam wanted to attend a camp before DMBA, but his medical file on Adam does not contain any forms or other information about any earlier camp. (Pl.'s Ex. F, William Bernstein Dep. 71.) Mrs. Doe testified that Adam did not contract any virus in the summer of 2004. (Pl.'s Ex. H, Jane Doe Dep. 68.) According to Mrs. Doe, Adam did not attend the prior camp because Mrs. Doe did not have adequate transportation. (<u>Id.</u> 18-19.)

application. (Id. 24, 26.)

In filling out the 2004 DMBA application, Mrs. Doe left the "Other Health Comments" line blank. (Id. 29.)  She did so because of Loscher's reaction to Adam's illness and because Adam's HIV doctor [Dr. Neu] told her she need not disclose Adam's HIV infection. (Id. 29, 32.)  Mrs. Doe then asked Bernstein to fill out the medical report and the camper medication form.[16]

Bernstein agonized over whether he should disclose Adam's HIV to DMDC.  Although he did not contact Neu, he testified that he did consult with other physicians in his practice on this issue. (Pl.'s Ex. F, William Bernstein Dep. 45, 46.) Thereafter, he decided to record Adam's HIV on the medical report and to inform DMDC about Adam.[17] (Id. 46. See also Pl.'s Ex. E, Adam Doe Application 1-4.)

---

[16] During 2004, Adam was taking antiretroviral medications twice daily, i.e., in the morning and at night and not during camp hours. (Pl.'s Ex. H, Jane Doe Dep. 14-15.)

[17] Bernstein could not recall whether Mrs. Doe requested him not to disclose Adam's HIV status, but he stated that it was possible that he encouraged Mrs. Doe to tell DMDC. (Pl.'s Ex. F, William Bernstein Dep. 66-68.)  Mrs. Doe testified that, before Bernstein completed the forms, she bumped into him in NCPG:

the next time I [saw] Dr. Bernstein he told me I put him in a very difficult situation and I got the feeling either he works for [DMDC] or he was working with somebody from [DMDC]. And he said I have to tell them about [Adam's] illness. And I said ["]do you have to["] and he said ["]yes["] . . . .

(Pl.'s Ex. H, Jane Doe Dep. 31-32.)  Mrs. Doe also did not want to list Adam's antiretroviral medications, as he would not be taking them during the camp hours. (Id. 34.)

On August 17 or 18, according to the Katz sisters, Bernstein informed them over the telephone that Adam was HIV-positive. He stated that he would not sign Adam's medical report unless Mrs. Doe disclosed the illness.[18] (Defs.' Answers, Interrog. 17; Pl.'s Ex. C, Roberta Katz Dep. 64-67, 69-70, 110; Pl.'s Ex. D, Carol Katz Dep. 16-17; Pl.'s Ex. F, William Bernstein Dep. 70-71.) Bernstein refused to provide information as to Adam in particular, but he was concerned whether DMBA had appropriate universal precautions protocols in place and suggested establishing such precautions for DMBA. (Pl.'s Ex. F, William Bernstein Dep. 30-31, 54, 56.) Bernstein did not recall mentioning that Adam's activities should be restricted in any way, recommending that Adam not attend DMBA, or discussing pools or toilets. (Id. 55, 56.) The Katz sisters told him they "ha[d] to get some further advice." (Id. 53.)

After calling Mrs. Doe several times to inform her that DMDC had not yet received Adam's medical forms, Gloskin finally talked with Mrs. Doe on Friday, August 20.[19] (Pl.'s Ex. E, Ellen Gloskin

---

[18] Bernstein admitted that he may have made a mistake in disclosing Adam's HIV, but claimed "it is better to do that than to sit here and tell you I'm not going to call the camp and tell them that this child has HIV." (Pl.'s Ex. F, William Bernstein Dep. 57.) He did not remember asking Mrs. Doe for her permission to disclose Adam's status. (Id.)

[19] According to Mrs. Doe, at some point she called Gloskin and informed her that Adam was HIV-positive, and Gloskin responded that DMDC had others with medical conditions and it was not a problem. (Pl.'s Ex. H, Jane Doe Dep. 37.) Mrs. Doe does not recall exactly when this conversation took place. (Id. 36-37.) Gloskin's notes indicate that this conversation happened on

12

Dep. 62; Pl.'s Ex. E, Ellen Gloskin Notes 1.)   Mrs. Doe told

Gloskin that she would have NCPG fax the forms. (Pl.'s Ex. E, Ellen

Gloskin Notes 1; Pl.'s Ex. H, Jane Doe Dep. 35-36.)   That morning,

DMDC received the forms without the camper medication form, and so

Gloskin once again called Mrs. Doe, who, that afternoon, went

personally to NCPG to fax the medication sheet. (Pl.'s Ex. E, Ellen

Gloskin Notes 1.)   As a consequence, DMDC did not receive all of

Adam's forms until the afternoon on the Friday before camp. (Pl.'s

Ex. C., Roberta Katz Dep. 69-70.)

Mrs. Doe granted Gloskin permission to speak with Bernstein.

(Pl.'s Ex. E, Ellen Gloskin Dep. 64; Pl.'s Ex. E, Ellen Gloskin

Notes 1.)   Thereafter, Gloskin called NCPG.[20]   However, Bernstein

was not available, and, instead, Gloskin spoke with Levy. (Pl.'s

Ex. E, Ellen Gloskin Dep. 72-73; Pl.'s Ex. E, Ellen Gloskin Notes

1; Pl.'s Ex. G, David Levy Dep. 34; Pl.'s Ex. C., Roberta Katz Dep.

79.)   The substance of this conversation is in dispute.

According to Gloskin and Roberta Katz, Levy reported that,

although he did not know exactly why Adam supposedly missed an

earlier camp that summer, he "thought [Adam] had a virus." (Pl.'s

_____

August 20. (Pl.'s Ex. E, Ellen Gloskin Dep. 62; Pl.'s Ex. E,
Ellen Gloskin Notes 1.)

[20] Defendants give two reasons for this phone call to NCPG:
(1) to figure out why Adam had missed another camp that summer
(Pl.'s Ex. C., Roberta Katz Dep. 82; Pl.'s Ex. E, Ellen Gloskin
Dep. 73) and (2) to understand the side effects of Adam's
medications. (Pl.'s Ex. E, Ellen Gloskin Dep. 79-80.)

Ex. C., Roberta Katz Dep. 79, 88. <u>See also</u> Pl.'s Ex. E, Ellen
Gloskin Notes 2.)  Levy also refused to give DMDC specifics on
Adam, as Adam was not his patient. (Pl.'s Ex. C, Roberta Katz Dep.
79, 87-93; Pl.'s Ex. G, David Levy Dep. 35.)  Thus, DMDC and Levy
spoke in hypotheticals. (Pl.'s Ex. C., Roberta Katz Dep. 87-93;
Pl.'s Ex. G, David Levy Dep. 35.)  Gloskin and Roberta Katz claim
that Levy told them that there could be "some sort of transmission
issue," as a child like Adam could have blood in his stool or
urine, and that Levy therefore recommended that DMDC use a separate
pool and bathroom. (Pl.'s Ex. C., Roberta Katz Dep. 87-93, 102.)
Levy allegedly affirmatively indicated that bleeding was a
potential side effect of Adam's medications rather than a general
concern about his HIV.[21] (Pl.'s Ex. E, Ellen Gloskin Dep. 82, 87-
88.)[22]  The Katz sisters and Gloskin took what they heard to be

---

[21] Gloskin testified that she did not think that blood in the
pool was a problem until Levy told her to be "cautious." (Pl.'s
Ex. E, Ellen Gloskin Dep. 90.)  Although she had her doubts, she
went with what he said. (<u>Id.</u> 88-90.)  It was Gloskin's
understanding that, by and large, HIV is not transmissible in a
swimming pool so long that the pool is properly clean and
chlorinated. (Pl.'s Ex. E, Ellen Gloskin Dep. 13, 88-89.)
However, she did mention that HIV in feces could make the pool
potentially unsafe for a period of time even if properly
chlorinated. (<u>Id.</u> 88-89.)  In addition, according to Gloskin, it
is possible to transmit HIV on a toilet. (<u>Id.</u> 13.)
    The Katz sisters knew that HIV was bloodborne. (Pl.'s Ex. D,
Carol Katz Dep. 30.)  But because they considered that different
diseases and medications affected children in different ways,
they did not do any background research specifically on HIV. (<u>Id.</u>
29.)

[22] Gloskin recorded in her notes that she "[a]sked Dr. Levy
if [Adam] had accident (urinate) in pool would pool be safe."

Levy's statements at face value, and did not do any additional research. (Pl.'s Ex. C., Roberta Katz Dep. 100.)

According to Levy, Gloskin called him because Adam's form "said [Adam] was HIV[-]positive, and she had some questions." (Pl.'s Ex. G, David Levy Dep. 33.) Levy states that Gloskin specifically asked <u>him</u> whether someone could transmit HIV to another camper if he were to urinate or defecate in the pool, urinate or defecate in a toilet bowl, or participate in contact sports. (<u>Id.</u> 35-36, 38.) In response, Levy told Gloskin that risk of HIV transmission was "[e]xtremely unlikely" and could only happen if the person had "gross"[23] amounts of blood in his urine or stool - in which case he would be too sick to participate in camp. (<u>Id.</u> 36, 37, 39.) According to Levy, Gloskin did not ask if Adam had this particular medical problem. (<u>Id.</u> 37.) Moreover, Levy denies recommending either a separate pool or a separate toilet for Adam, (<u>id.</u> 41) and does not remember discussing Adam's fitness to attend camp, any earlier illnesses he might have had, or medications that Adam took. (<u>Id.</u> 41, 43, 60.) Further, he told Gloskin that, as to potential collisions resulting from contact

---

(Pl.'s Ex. E, Ellen Gloskin Notes 1; Pl.'s Ex. E, Ellen Gloskin Dep. 79.) Levy apparently answered that "[i]t would only be a problem if blood in urine" and "[i]f [Adam] bl[ed] in bathroom it would have to be cleaned appropriately." (Pl.'s Ex. E, Ellen Gloskin Notes 1; Pl.'s Ex. E, Ellen Gloskin Dep. 81.)

[23] "Gross" in this context connotes visible blood. (Pl.'s Ex. G, David Levy Dep. 60-61.)

sports, there would be small risks but transmission was nonetheless unlikely and, in any event, the camp should be taking universal precautions. (Id. 41-43.)

At this point on Friday afternoon, Gloskin and the Katz sisters worried that they had insufficient time to do research on Adam's health. (Pl.'s Ex. E, Ellen Gloskin Dep. 94.) Roberta felt suspicious toward Mrs. Doe as Mrs. Doe did not disclose Adam's medical history earlier, thereby denying the camp sufficient time to prepare themselves to keep Adam and other children safe.[24] (Pl.'s Ex. C., Roberta Katz Dep. 71-72, 77-78, 102-03.) The Katz sisters were unable, after receiving Adam's medical forms, to discuss the matter with Bernstein. (Id. 92-93.) In addition, they had not yet researched Adam's medications enough to know potential side effects and/or susceptibility to gastrointestinal upsets, the latter of which would be, according to Gloskin, potentially transmissible in a swimming pool. (Pl.'s Ex. E, Ellen Gloskin Dep. 83-84, 100.) They were concerned about their inability, as they saw it, to account for risks associated with Adam's participation in DMBA, such as providing him a separate pool or toilet as allegedly recommended by Levy. (Pl.'s Ex. C., Roberta Katz Dep. 92-93.) But, regardless of these concerns, neither Gloskin nor the Katz sisters

---

[24] When Roberta discovered that Loscher already knew of Adam's HIV-seropositivity, this fact "hit [her] like a truck." (Pl.'s Ex. C., Roberta Katz Dep. 113.)

telephoned Mrs. Doe or Adam's HIV specialist.[25] (Pl.'s Ex. E, Ellen
Gloskin Dep. 95-96.)

On Saturday, Roberta called Mrs. Doe to let her know that they
were unable to make reasonable accommodations for Adam and, as a
consequence, they could not allow him to attend DMBA.[26] (Pl.'s Ex.
C., Roberta Katz Dep. 96, 112.) According to Mrs. Doe, Roberta
mentioned that Levy "really wouldn't recommend [Adam] going" to
DMBA as well as Levy's advice that Adam could potentially transmit
HIV through blood in his urine or in his stool.[27] (Pl.'s Ex. H, Jane
Doe Dep. 40-42.) Mrs. Doe denied that Adam had problems with
bloody stool or urine. (Id. 40-41) Nonetheless, Roberta explained

---

[25] Roberta did not call Mrs. Doe on Friday because it was
after business hours and she had other important things to attend
to. (Pl.'s Ex. C., Roberta Katz Dep. 95.)

[26] Mrs. Doe testified that Roberta told her:

that [Adam] would not be allowed to come to the camp
because they didn't have enough medical research done.
So I turned around and I said to her ["]I thought this
was a medically supervised place.["] She said ["]it
is["] and I said ["]well, you know what is the
problem,["] and she said ["]it is not like it is arts
and crafts they can get hurt["] I said ["]I'm well
aware of basketball I have cement in the back, we put
cement in the back and we did put a basket -- a hoop up
for [Adam] to play.["]

(Pl.'s Ex. H, Jane Doe Dep. 39.)

[27] Mrs. Doe, however, does not remember Roberta mentioning
the need for a separate pool or toilet for Adam. (Pl.'s Ex. H,
Jane Doe Dep. 43.)

that DMBA could not accept Adam.[28]  Thereafter, Mrs. Doe received

a complete refund of all admission fees. (Id. 24.)

## E. The Instant Action

As noted above, Plaintiff[29] brings this action for violations

of Title III of the ADA[30] and the NYHRL.  He argues that Defendants

unlawfully discriminated against him on the basis of his

disability, i.e., his HIV-seropositivity, by excluding him from

participation in the August 2004 basketball camp.  To redress his

injuries, including emotional and psychological harm, Adam requests

declaratory, compensatory, and injunctive relief, as well as

attorney's fees and costs.  Defendants have raised affirmative

defenses of failure to state a claim; existence of legitimate

nondiscriminatory reasons for denial of admission; direct threat;

and unclean hands.[31]

---

[28] Mrs. Doe then called Levy to ask him about his comments;
Levy told her that he did not recommend to anyone at DMDC that
they disallow Adam from attending DMBA. (Id. 43-44.)

[29] Plaintiff brings this action by and through his parent and
natural guardian Jane Doe.

[30] Congress enacted the ADA to "provide a clear and
comprehensive national mandate for the elimination of
discrimination against individuals with disabilities." Henrietta
D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003) (quoting 42
U.S.C. § 12101(b)(1)) (quotation marks omitted).  The ADA's first
three titles "proscribe discrimination against individuals with
disabilities in employment and hiring (Title I), access to public
services (Title II), and public accommodations (Title III)." Id.
Only Title III is implicated in this case.

[31] While neither party has moved for summary judgment on
Defendants' "unclean hands" defense, discovery has concluded in

this case and "[t]he record . . . reflect[s] the losing party's
inability to enhance the evidence supporting its position and the
winning party's entitlement to judgment." Ramsey v. Coughlin, 94
F.3d 71, 74 (2d Cir. 1996). Initially, the court notes that
there is some doubt as to the applicability of unclean hands to
ADA actions. Cf. McKennon v. Nashville Banner Publ'g Co., 513
U.S. 352, 360 (1995) (noting that the Court has "rejected the
unclean hands defense where a private suit serves important
public purposes." (quoting Perma Life Mufflers, Inc. v. Int'l
Parts Corp., 392 U.S. 134, 138 (1968)) (quotation marks
omitted)); see Riad v. 520 S. Mich. Ave. Assocs., No. 97 C 2488,
2000 U.S. Dist. LEXIS 7646, at *39-40 (N.D.Ill. May 22, 2000).
But the court need not address this issue because, as explained
below, the record provides no support for Defendants' claim.

Assuming *arguendo*, then, that an unclean hands defense is
applicable to an ADA claim, the court analyzes the record to
determine whether, under New York law, there is sufficient
evidence to support the elements of an unclean hands defense.
According to New York law, the doctrine of unclean hands requires
the defendant to prove that (1) the plaintiff is guilty of
immoral, unconscionable conduct; (2) the conduct was relied upon
by the defendant; and (3) the defendant was injured thereby.
Nat'l Distillers & Chem. Corp. v. Seyopp Corp., 214 N.E.2d 361,
362 (N.Y. 1966). Defendants have provided no evidence of immoral
or unconscionable conduct by Plaintiff. While Defendants fault
Plaintiff for keeping Adam's HIV-seropositivity confidential,
Plaintiff has presented uncontroverted evidence that doctors and
public health authorities support the maintenance of HIV
confidentiality. (Pl.'s Ex. A in Further Supp. of Pl.'s Mot. for
Summ. J. ("Pl.'s Further Ex. A"), Work Group Recommendations,
Work Group III: Risk Reduction for Maternal/Fetal Transmission,
in Public Health Service, U.S. Department of Health and Human
Services, Report of the Surgeon General's Workshop on Children
with HIV Infection and Their Families 55, 56 (1987); Pl.'s
Further Ex. A, Work Group Recommendations, Work Group IV:
Education Issues for Children Already Infected with HIV,
Including Day Care and Schooling, in Report of the Surgeon
General's Workshop, *supra*, at 57-59; Pl.'s Further Ex. A,
Education and Foster Care of Children Infected with Human
T-Lymphotropic Virus Type III/Lymphadenopathy-Associated Virus,
34 Morbidity and Mortality Weekly Report 517 (Aug. 30, 1985), in
Report of the Surgeon General's Workshop, *supra*, at App. E, 97,
98, 100; Pl.'s Ex. L, New York State Department of Health, 100
Questions & Answers about AIDS/HIV 23 (Apr. 1998).)

It follows that Plaintiff's actions cannot support
Defendants' alleged claim of unclean hands. The court therefore

Now, in their cross motions for summary judgment, the parties place before the court the issues of whether HIV-seropositivity qualifies as a "disability" and whether Defendants' denial of admission constitutes discrimination "on the basis of" that disability. Plaintiff's motion additionally argues that Defendants conclusively qualify as "public accommodations" prohibited from engaging in such discrimination.

## II. Standard of Review

Under the familiar standard, summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citation and quotation marks omitted). See also Fed. R. Civ. P. 56(c)(2). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir. 1987).

In analyzing a party's motion for summary judgment, the court must construe the facts in the light most favorable to the

_____

grants to Plaintiff summary judgment on this defense.

nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party. Flanigan v. Gen. Elec. Co., 242 F.3d 78, 83 (2d Cir. 2001) (citation omitted). But "[t]he party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible," and may not rest on "mere allegations or denials." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (internal citations and quotation marks omitted). Rather, where the moving party has appropriately supported its motion, the nonmoving party must produce specific, particularized evidence to establish the existence of a genuine factual issue. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

### III. Adam's ADA Claim for Declaratory Relief[32]

In order to establish a *prima facie* case for declaratory relief pursuant to the ADA Title III, Adam must establish that: (a) he has a "disability"; (b) Defendants are owners or operators of a place of "public accommodation"; and (c) Defendants discriminated against him, on the basis of his disability, by denying him a "full and equal opportunity" to participate in DMBA on DMDC premises. See Roberts v. Royal Atl. Corp., 542 F.3d 363, 368 (2d Cir. 2008), cert. denied, __ U.S. __, 129 S. Ct. 1581 (2009) (citing Camarillo, 518 F.3d at 156); 42 U.S.C. § 12182(a).

The court will therefore address below each of these elements necessary for summary judgment as to the ADA, concluding that Adam qualifies as having a disability, that the DMDC and DMBA are public

---

[32] Plaintiff additionally asks the court for injunctive relief pursuant to the ADA and NYHRL. However, Plaintiff has presented no evidence that he still wishes to attend DMBA or DMDC; instead, according to Mrs. Doe, Adam has no interest in attending any camp at all. (See Pl.'s Ex. H, Jane Doe Dep. 55.) Adam has failed to demonstrate a "plausible intention or desire to return" to DMBA or DMDC "but for barriers of access of which he is aware." Shaywitz v. Am. Bd. of Psychiatry & Neurology, No. 09 Civ. 4387(VM), 2009 U.S. Dist. LEXIS 119485, at *15 (S.D.N.Y. Dec. 17, 2009). See also Access 4 All v. G & T Consulting Co., No. 06 Civ. 13736 (DF), 2008 U.S. Dist. LEXIS 30594, at *4 (S.D.N.Y. Mar. 28, 2008). As such, Adam lacks standing to seek injunctive relief on his own behalf. See Camarillo v. Carrols Corp., 518 F.3d 153, 158 (2d Cir. 2008). See also Small v. Gen. Nutrition Cos., 388 F. Supp. 2d 83, 86-87 (E.D.N.Y. 2005). Further, to the extent Plaintiff wishes to obtain injunctive relief on behalf of other potential HIV-positive DMBA or DMDC campers, he also lacks standing to do so. See Summers v. Earth Island Inst., __ U.S. __, __, 129 S. Ct. 1142, 1149 (2009).
Plaintiff does not seek monetary damages pursuant to the ADA. (See Compl. 11-12.)

accommodations for purposes of the ADA, and that Adam's HIV played a substantial part in the DMDC's denial of his admission. Finally, the court will address Defendants' defense that they reasonably determined that Adam posed a direct threat to other campers' safety.

## A. Adam's "Disability"

Although they claim that Adam is not disabled, Defendants do not dispute that Adam is HIV-positive, and the Court of Appeals has concluded that HIV infection qualifies as a disability under the ADA. Rivera v. Heyman, 157 F.3d 101, 103 (2d Cir. 1998) ("HIV infection is a disability under the [ADA]" (citing Bragdon v. Abbott, 524 U.S. 624, 639-45 (1998))). See also Brown v. 820 River St., Inc., No. 1:08-CV-0130 (LEK/DRH), 2009 U.S. Dist. LEXIS 70370, at *3 n.2 (N.D.N.Y Aug. 10, 2009). This conclusion is buttressed by Department of Justice ("DOJ") regulations[33] as well as the legislative history of the ADA.[34] As a consequence, Adam's Motion

___

[33] Pursuant to statute, DOJ issues regulations implementing Title III of the ADA. See 42 U.S.C. § 12186(b). The court accordingly defers to these regulations to the extent they are reasonable constructions of the ADA. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-45 (1984). See also Bragdon, 524 U.S. at 646.

As applicable here, these DOJ regulations recognize HIV-seropositivity as a disability. See 28 C.F.R. pt. 36, App. B (2004). See also 28 C.F.R. pt. 35, App. A. Accord 18 Op. Off. Legal Counsel 141, 142-43 (1994); 12 Op. Off. Legal Counsel 209, 214-18 (1988); 29 C.F.R. pt. 1630, App., § 1630.2(j).

[34] S. Rep. No. 101-116, at 19 (1989) (quoting the Presidential Comm'n on the HIV Epidemic recommendations that "[a]ll persons with symptomatic or asymptomatic HIV infection

for Summary Judgment as to disability is GRANTED.  For the same

reasons, Defendants' Motion for Summary Judgment on disability is

DENIED.

## B. DMBA and DMDC as "Place[s] of Public Accommodation"

Next, Plaintiff argues that DMBA and DMDC, as camps for

---

should be clearly included as persons with disabilities who are
covered by the anti-discrimination protections of this
legislation"); id. at 22 ("As noted by the [DOJ] . . . . a person
infected with [HIV] is covered under the first prong of the
definition of the term 'disability.'"); H.R. Rep. No. 101-485,
pt. 2, at 52 (1990) (same); H.R. Rep. No. 101-485, pt. 3, at 75
("Individuals who are homosexual or bisexual and are
discriminated against because they have a disability, such
infection with [HIV], are protected under the ADA."); H.R. Rep.
No. 101-485, pt. 4, at 75 (same); Americans with Disabilities Act
of 1988: Joint Hearing on S. 2345 Before the Subcomm. on the
Handicapped of the S. Comm. on Labor and Human Resources and the
Subcomm. on Select Education of the H. Comm. on Education and
Labor, 100th Cong., 2d Sess. 51, 53 (1988) (Ch. 9 of the Report
of the President's Comm'n on the [HIV] Epidemic) ("The Commission
supports the position that Section 504 [of the Rehabilitation
Act] coverage applies to persons who are HIV[-] positive yet
asymptomatic."); id. 39 (Statement of Adm. James Watkins,
Chairperson of President's Comm'n on the [HIV] Epidemic) ("[T]he
Commission was confronted with a problem of discrimination
against individuals with HIV[-]seropositivity and all states of
HIV infection"); Americans with Disabilities Act of 1989:
Hearings on S. 933 Before the S. Comm. on Labor and Human
Resources and the Subcomm. on the Handicapped, 101st Cong., 1st
Sess. 612, 612-23 (1989) (Overview of AIDS and HIV Case Law
Prepared by Chai R. Feldblum, Legislative Counsel for ACLU AIDS
Project) (explaining extension of disability protection to those
with asymptomatic HIV with respect to the Rehabilitation Act and
the Fair Housing Act); Americans with Disabilities Act of 1989:
Hearings on H.R. 2273 Before the H. Comm. on the Judiciary and
the Subcomm. on Civil and Constitutional Rights, 101 Cong., 1st
Sess. 170 (1989) (Statement of Rev. Scott Allen, Comm'r for
National Comm'n on AIDS) ("All persons with symptomatic or
asymptomatic HIV infections should be clearly included as persons
with disabilities, who are covered by the antidiscrimination
protections of [the ADA] legislation.").

children, qualify as "owners and operators" of "a place of public accommodation" pursuant to 42 U.S.C. § 12182(a). Defendants do not contest this issue, and, indeed, refer to themselves as "public accommodations." (See Defs. [DMDC] and [DMBA]'s Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. 22 n.32.) Moreover, Plaintiff has clearly established that DMDC and DMBA "own" and "operate" camps. A "camp" is "[a] place in the country that offers simple group accommodations and organized recreation or instruction, as for vacationing children," and "[a] place where athletes engage in intensive training . . . ." American Heritage Dictionary of the English Language 276 (3d ed. 1996). The ADA provides several categories of "public accommodations" into which camps fit, including "place[s] of recreation," 42 U.S.C. § 12181(7)(I), "place[s] of education," id. § 12181(7)(J), and "place[s] of exercise and recreation." Id. § 12181(7)(L). Accord 28 C.F.R. § 36.104. Therefore, Adam's Motion for Summary Judgment as to "public accommodation" is GRANTED.

## C. Defendants' Adverse Action "on the Basis of" Adam's Disability

Under the ADA, a disabled individual may not "be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ." 42

U.S.C. § 12182(a). Accord 28 C.F.R. § 36.201.[35] Thus, Adam has the burden to prove that Defendants discriminated against him within the meaning of the ADA. Camarillo, 518 F.3d at 156. "[D]iscrimination," as used in section 12182(a), is defined by the ADA as, among other things:

> (I) the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered;[36]

> (ii) a failure to make reasonable[37] modifications

---

[35] Public accommodations are therefore prohibited from, on the basis of disability:

subject[ing] an individual or class of individuals . . . directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from [its] goods, services, facilities, privileges, advantages, or accommodations . . . .

42 U.S.C. § 12182(b)(1)(A)(I). Accord 28 C.F.R. § 36.202(a).

[36] That said, "[a] public accommodation may impose legitimate safety requirements that are necessary for safe operation." 28 C.F.R. § 36.301(b). But these "safety requirements" must be "based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities." Id.

[37] "[T]he determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." Staron v. McDonald's Corp., 51 F.3d 353, 356 (2d Cir. 1995) (citation omitted).

in policies, practices, or procedures, when such
modifications are necessary to afford such goods,
services, facilities, privileges, advantages, or
accommodations to individuals with disabilities, unless
the entity can demonstrate that making such modifications
would fundamentally alter the nature of such goods,
services, facilities, privileges, advantages, or
accommodations;

(iii) a failure to take such steps as may be
necessary to ensure that no individual with a disability
is excluded, denied services, segregated or otherwise
treated differently than other individuals because of the
absence of auxiliary aids and services, unless the entity
can demonstrate that taking such steps would
fundamentally alter the nature of the good, service,
facility, privilege, advantage, or accommodation being
offered or would result in an undue burden [[38]] . . . .

42 U.S.C. § 12182(b)(2)(A). Accord 28 C.F.R. §§ 36.301(a),

36.302(a), 36.303(a). See also 28 C.F.R. § 36.204 ("A public

accommodation shall not . . . utilize standards or criteria . . .

that have the effect of discriminating on the basis of

disability").[39]

It follows that "[t]o establish discrimination under . . . the

ADA, [a] plaintiff[] ha[s] three available theories: (1)

intentional discrimination (disparate treatment); (2) disparate

---

[38] An "undue burden" connotes "significant difficulty or
expense." 28 C.F.R. § 36.303(a).

[39] A public accommodation also has affirmative
responsibilities, including

maintain[ing] in operable working condition those
features of facilities and equipment that are required
to be readily accessible to and usable by persons with
disabilities . . . .

Id. § 36.211.

impact; and (3) failure to make a reasonable accommodation."
Tsombanidis v. W. Haven Fire Dep't, 352 F.3d 565, 573 (2d Cir.
2003).   Plaintiff raises only the first of these theories of
liability.

   **DMDC's Intentional Discrimination:**

   To state a claim for intentional discrimination, or disparate
treatment, under the ADA, Adam "must present evidence that animus
against the protected group was a significant factor in the
position taken" by Defendants. Reg'l Econ. Cmty. Action Program,
Inc. v. City of Middletown, 294 F.3d 35, 49 (2d Cir. 2002)
(citations, emphasis, and quotation marks omitted).    This
"significant factor" standard creates a "mixed-motive" theory of
liability in which a plaintiff's disability need not be a but-for
cause of a defendant's actions. See Parker v. Columbia Pictures
Indus., 204 F.3d 326, 336-37 (2d Cir. 2000).   "[T]he existence of
additional factors causing an injury does not necessarily negate
the fact that the defendant's wrong is also the legal cause of the
injury," Henrietta D., 331 F.3d at 278 (citation omitted), so long
as "the plaintiff can show that the disability was a substantial
cause of the exclusion or denial . . . ." Id. at 291.   In other
words, in order for Plaintiff to prevail, Adam's HIV infection must
have constituted a "motivating factor" for Defendants' denial of
his admission to the basketball camp. Parker, 204 F.3d at 337

(citation omitted).[40]

However, Adam does not have to present direct evidence that his HIV was a significant factor in Defendants' denial of his admission to basketball camp. Rather, Defendants' discriminatory intent or animus "may be inferred from the totality of the circumstances, including the historical background of the decision; the specific sequence of events leading up to the challenged decision; and contemporary statements by [Defendants]." Reg'l Econ. Cmty. Action Program, 294 F.3d at 49 (citation, quotation marks, and alterations omitted).

Plaintiff argues that, "[e]ven crediting each of [D]efendants' various reasons for denying Adam admission [including the need to provide a separate pool and toilet as well as his secrecy surrounding HIV-seropositivity], none is independent of Adam's HIV status; rather, they are all based on stereotypes and irrational fear about people with HIV." (Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. 17-23.) Although Adam assumes, arguendo, that

_____

[40] Supreme Court case law may indicate that the Court would disapprove of this causation standard, and would instead mandate a higher "but-for" standard. See Gross v. FBL Fin. Servs., Inc., __ U.S. __, __, 129 S. Ct. 2343, 2350-51 (2009). See also Crouch v. J C Penney Corp., No. 08-40325, 2009 U.S. App. LEXIS 14362, at *7 n.1 (5th Cir. July 1, 2009) (per curiam). However, as the Supreme Court has not yet discussed causation specifically with respect to the ADA, this court will follow controlling Second Circuit jurisprudence. The court notes, however, as will be discussed below, that all of the reasons asserted by Defendants as a basis for their refusal to admit Adam are related to his HIV condition. Thus, Adam adequately supports his claim under the higher "but-for" standard.

29

Defendants were motivated by side effects of his medications and the claim that Adam missed another summer camp, he states that these concerns do not absolve Defendants of liability so long as HIV was also a motivating factor. (Id. 23-25.) Defendants dismiss Plaintiff's allegations as merely conclusory and therefore an inadequate basis for opposing Defendants' Motion for Summary Judgment on this issue.

But Defendants' objection is not well founded. Rather, taking Plaintiff's facts to be true and resolving inferences in favor of Plaintiff, record evidence establishes that Adam's HIV-seropositivy played a motivating part in DMDC's decision to deny him admission. Testimony from Roberta Katz, as presented in her deposition, demonstrates that part of her concerns about admitting Adam related to the need for a separate pool and bathroom for HIV-positive campers. (See Pl.'s Ex. C., Roberta Katz Dep. 89-93, 103-04.) Moreover, Roberta's concerns, also discussed in her deposition, that Mrs. Doe did not provide a full medical history, related specifically to Adam's HIV-seropositivy as well as his HIV medications. (See Pl.'s Ex. C., Roberta Katz Dep. 71-72, 76-77, 102-03.) Questions posed to and specific answers received from Levy during the August 20 telephone conversation also focused on Adam's HIV transmission and the alleged heightened risks posed by side effects of his medications. (Pl.'s Ex. C., Roberta Katz Dep. 80-93; Pl.'s Ex. E, Ellen Gloskin Dep. 81-84; Pl.'s Ex. E, Ellen

Gloskin Notes 1; Pl.'s Ex. G, David Levy Dep. 35-45.) Moreover, Mrs. Doe testified that Roberta expressed concerns about Adam transmitting HIV to others. (See Pl.'s Ex. H, Jane Doe Dep. 39-41.) This evidence supports the inference that DMDC denied Adam admission because of his disability.

On the other hand, in response to Plaintiff's motion, Defendants have presented no evidence to raise an issue of fact for trial with regard to DMDC's denial of admission. Defendants insist that other considerations led to their decision to deny Adam admission, such as their concern about the side effects of Adam's medications and his alleged absence at an earlier camp. (Pl.'s Ex. C, Roberta Katz Dep. 75-79; Pl.'s Ex. E, Ellen Gloskin Dep. 82-84, 98-100.) But Defendants' asserted alternate justifications for denying Adam admission confirm, rather than counteract, Plaintiff's allegations. Defendants particularly focus on the existence of side effects of antiretroviral medications, and present evidence to this effect. Even assuming the truth of Defendants' allegations, however, the fact that Adam may take medications with certain side effects is inseparable from the fact that Adam is HIV-positive. Discriminating against Adam because of medicinal side effects, therefore, still constitutes discrimination on the basis of Adam's disability. Moreover, undisputed facts from the record demonstrate that DMDC's concerns with regard to Plaintiff's medicine relate to risks of his transmission of HIV to other campers, as a result of

bleeding that might be caused by his medication. Therefore, this concern is also inseparable from Adam's condition.

As to Adam's alleged illness in June, this illness only influenced DMDC's decision to deny Adam admission in August insofar as it roused suspicion that Adam's HIV infection made him vulnerable to contagious opportunistic infections. Hence, both of these "alternate" justifications are clearly related to Adam's HIV, and thus confirm that the denial of admission was based on Adam's disability. Thus, no reasonable jury could find that HIV was not a substantial factor -- or, indeed, a but-for cause -- in Defendants' decision to deny Adam admittance to DMDC.

**DMBA's Intentional Discrimination:**

It is not clear from the record, however, that DMDC's intentional discrimination may also be imputed to the DMBA,[41] as it is unclear to the court whether a sufficient relationship existed between DMDC and DMBA so as to hold the latter liable for acts of the former. Therefore, due to the complexities of and necessity for fact-specific inquiries concerning business entity relationships, and because the parties have not yet briefed this issue, the court will not grant summary judgment as to DMBA at this time, because a genuinely disputed issue of fact may remain for

---

[41] Although Mrs. Doe mentioned an adverse reaction she received from Loscher after she informed him of Adam's HIV infection (Pl.'s Ex. H, Jane Doe Dep. 29), Plaintiff does not allege that any actions on the part of Loscher or any other DMBA-specific staff constituted discrimination against him.

trial.

*   *   *   *

As a result, on the issue of DMDC's disparate treatment of
Adam on the basis of his disability, the court GRANTS Plaintiff's
Motion for Summary Judgment. The court, however, DENIES
Plaintiff's motion as to DMBA. The court also DENIES Defendants'
Motion for Summary Judgment on this issue.

**Direct Threat Defense:**

Finally, the court turns to Defendants' claim that Adam's HIV
poses a direct threat to other campers' safety so as to preclude
ADA liability.[42] Defendants, however, have not presented the court
with evidence of the objective reasonableness of their direct
threat determination sufficient to survive summary judgment.

As a threshold legal matter, the ADA allows Defendants to
assert an affirmative "direct threat" defense. Specifically, a
public accommodation is not "require[d] to permit an individual to
participate in or benefit from the goods, services, facilities,
privileges, advantages and accommodations . . . where such
individual poses a direct threat to the health or safety of
others." 42 U.S.C. § 12182(b)(3). The ADA defines "direct threat"
as "a significant risk to the health or safety of others that

---

[42] Defendants have both moved for summary judgment on this
affirmative defense. Regardless of whether DMBA is responsible
for DMDC's actions, the resolution of this issue affects both
parties. The court will thus assume, for purposes of its direct
threat analysis, that Defendants acted in concert.

33

cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." Id. Accord 28 C.F.R. § 36.208(b). "To constitute a 'direct threat,' the probability of significant harm must be substantial, constituting more than a remote or slightly increased risk." Hatzakos v. Acme Am. Refrigeration, Inc., No. 03-CV-5428 (DLI)(VVP), 2007 U.S. Dist. LEXIS 49034, at *26-27 (E.D.N.Y. July 6, 2007). See also New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 306 (3d Cir. 2007) ("The purported risk must be substantial, not speculative or remote.")

In making its direct threat determination, a public accommodation must:

> make an individualized assessment, based on reasonable
> judgment that relies on current medical knowledge or on
> the best available objective evidence, to ascertain: the
> nature, duration, and severity of the risk; the
> probability that the potential injury will actually
> occur; and whether reasonable modifications of policies,
> practices, or procedures will mitigate the risk.

28 C.F.R. § 36.208(c) (emphasis added). Accord Sch. Bd. of Nassau County v. Arline, 480 U.S. 273, 287-88 (1987); Lovejoy-Wilson v. Noco Motor Fuel, Inc., 263 F.3d 208, 220 (2d Cir. 2001). These factors provide for the evaluation of objective medical evidence while "protecting others from significant health and safety risks, resulting, for instance, from a contagious disease." Bragdon, 524 U.S. at 649. See also Arline, 480 U.S. at 287 & n.16 (balancing the rights of disabled individuals while "giving appropriate weight to

such legitimate concerns of [public accommodations] as avoiding exposing others to significant health and safety risks" of the disabled individual "communicating an infectious disease to others"). But the ADA does not sanction "deprivations based on prejudice, stereotypes, or unfounded fear." <u>Arline</u>, 480 U.S. at 287. The focus is on the objective reasonableness of Defendants' assessment of the significance of the risk of transmission.

In making a determination of objective reasonableness, the fact-finder's responsibility does not involve "independently assess[ing] whether it believes that [Plaintiff himself] posed a direct threat." <u>Jarvis v. Potter</u>, 500 F.3d 1113, 1122 (9th Cir. 2007). Rather, the fact-finder determines the <u>reasonableness</u> of Defendants' actions based upon "reasonable medical judgments of public health authorities." <u>Arline</u>, 480 U.S. at 288. "[O]f special weight and authority" are "views of public health authorities[] such as the U.S. Public Health Service ["PHS"], CDC, and the National Institutes of Health ["NIH"]." <u>Bragdon</u>, 524 U.S. at 650 (citations omitted). In other words, in the absence of objective medical evidence to the contrary, the fact-finder views the reasonableness of Defendants' actions in light of the views of the CDC/PHS/NIH and similar medical authorities. The factual inquiry looks to available medical evidence, and, in light of this evidence, makes an "individualized determination on the significance of the risk . . . ." <u>Doe v. County of Centre, Pa.</u>, 242

F.3d 437, 448 (3d Cir. 2001). See also id. ("Decisions are not permitted to be based on generalizations about the disability but rather must be based on the facts of an individual case . . . The purpose of creating the 'direct threat' standard is to eliminate exclusions which are not based on objective evidence about the individual involved." (quoting H.R. Rep. No. 101-485, pt. 3, at 45) (emphasis omitted)); 18 Op. Off. Legal Counsel at 146-47.

Thus the issue presented is whether Defendants have submitted sufficient evidence to permit a jury to conclude that their threat evaluation -- that there was a danger that Adam could transmit his condition to other campers -- was objectively reasonable. A plaintiff like Adam is "not required to prove that he [] poses no risk." Lovejoy-Wilson, 263 F.3d at 220 (quoting H.R. Rep. No. 101-485, pt. 3, at 46). In contrast, a defendant "asserting a 'direct threat' as a basis for excluding an individual bears a heavy burden of demonstrating that the individual poses a significant risk to the health and safety of others." Lockett v. Catalina Channel Express, Inc., 496 F.3d 1061, 1066 (9th Cir. 2007) (citing Bragdon, 524 U.S. at 649-50). To survive summary judgment, Defendants have the responsibility to present the court with objective, medical evidence -- such as reliable medical guidelines, literature, or expert testimony -- to establish that their direct threat assessment was reasonable. See, e.g., Bragdon, 524 U.S. at 650-54; Lovejoy-Wilson, 263 F.3d at 220-21.

36

Plaintiff argues that the direct threat determination cannot rely on stereotypes or unfounded fears, and thus Defendants failed to demonstrate that Adam posed a significant risk. In addition, Plaintiff asserts that there is no "insufficient time" exception to the statutory direct threat analysis, and, even should such an exception exist, that Defendants have provided no evidence to support their assertions. All medical information was readily available to Defendants, and yet Defendants did not attempt to educate themselves beyond asking one doctor.

Defendants argue that they were not afforded a reasonable time to conduct an individualized assessment to make a direct threat determination or to provide reasonable accommodation for that threat. Defendants claim that a small but theoretically-sound risk of transmission can be significant given the heightened danger posed by HIV infection. Moreover, Defendants deny that it was feasible for them to know all information about all diseases, and, claim, thus, it was reasonable for them to rely on Levy's advice.

Defendants, however, have provided the court with no objective, medical evidence to support their threat determination. The only evidence Defendants present relates to the potential side effects of Adam's medications. (See Defs.' Exs. 2-9 in Supp. of Mot. for Summ. J.) These exhibits, however, fail to mention "bleeding" in stool or urine as side effects of Adam's medication. In any case, whether Adam had this risk of bleeding is of limited

relevance.  According to public health authorities' publications

available to Defendants in 2004, HIV cannot survive outside the

body, and, hence, cannot survive in a swimming pool[43] or on a toilet

seat.[44]    Moreover,  it  is  highly  unlikely  that  HIV  will  be

transmitted through contact sports.[45]  In light of this widespread,

---

[43] (Pl.'s Further Ex. A, <u>Walter R. Dowdie, Approaches to Prevention of HIV Infection, in Report of the Surgeon General's Workshop</u>, *supra* note 30, at 20 (HIV not spread through water); Pl.'s Further Ex. B, <u>Centers for Disease Control, Department of Health and Human Services, HIV and Its Transmission</u> 1 (July 1999) (no instances of water transmission); Pl.'s Ex. L, <u>100 Questions and Answers about AIDS/HIV</u>, *supra* note 30, at 4, 9.) <u>See also Centers for Disease Control, U.S. Department of Health and Human Services, Understanding AIDS</u> 3 (1988), <u>available at</u> http://profiles.nlm.nih.gov/QQ/B/D/R/L/_/qqbdrl.pdf.

[44] (Pl.'s Further Ex. B, <u>HIV and Its Transmission</u>, *supra* note 42, at 2 (HIV not transmitted by contact with "environmental surfaces" and household instances of transmission are "very rare"); Pl.'s Ex. L, <u>100 Questions & Answers about AIDS/HIV</u>, *supra* note 30, at 4-5, 9 (HIV not transmitted on a toilet seat).) <u>See also Centers for Disease Control, U.S. Department of Health and Human Services, HIV and AIDS: Are You at Risk?</u> 4 (Mar. 2000), <u>available at</u> http://www.nebraskaprevlink.ne.gov/clearinghouse/catalog/health_m ental_health/infectious_diseases/hivaidsrisk.pdf (same); <u>New York State Department of Health, HIV and AIDS Facts</u> 7 (2004), http://www.health.state.ny.us/diseases/aids/docs/hivfacts.pdf (same).

[45] (Pl.'s Further Ex. A, <u>Martha F. Rogers, Transmission of Human Immunodefiency Virus Infection in the United States, in Report of the Surgeon General's Workshop</u>, *supra* note 30, at 19 (HIV transmission through casual contact is "extremely rare" to nonexistent); Pl.'s Further Ex. A, <u>Dowdie</u>, *supra* note 42, at 20 (same); Pl.'s Further Ex. B, <u>HIV and Its Transmission</u>, *supra* note 42, at 3 (HIV not transmitted through sweat); Pl.'s Ex. L, <u>100 Questions & Answers About HIV/AIDS</u>, *supra* note 30, at 23 ("highly unlikely" that HIV will be transmitted while playing football, schoolyard fights, or other sports).)

established medical opinion,[46] unless Defendants can present

objective medical evidence to the contrary, no reasonable jury

could find that Defendants acted reasonably. Defendants, however,

do not provide such evidence.

Nurse Gloskin[47] did provide deposition testimony that HIV in

stool can survive in swimming pool water and that HIV can be

transmitted by blood on a toilet seat. However, while a health

care professional, such as a registered nurse like Gloskin, may

disagree with "the prevailing medical consensus," she must provide

"a credible scientific basis for deviating from the accepted norm."

Bragdon, 524 U.S. at 650. Opinions from health care workers do

not constitute objective medical evidence absent such a basis. Id.

---

[46] Defendants question the wisdom of requiring public
accommodations to surf the internet for information that is
likely inaccurate. Defendants are partially correct in that none
of the ADA opinions, including this one, come close to requiring
a public accommodation to sift through potential misinformation
from online sources. But such a limitation does not affect the
probative value of the views of public health authorities.
Simply because CDC and other public health authorities'
publications are available online does not necessarily make these
publications any less reliable.

[47] Although Gloskin was not the final decision maker, she
substantially contributed to the decision to deny Adam admission.
Her actions are imputed to DMDC via vicarious liability. See
Bowen v. Rubin, 385 F. Supp. 2d 168, 180 (E.D.N.Y. 2005); Palmer
v. City of Yonkers, 22 F. Supp. 2d 283, 287 (S.D.N.Y. 1998);
Simenson v. Hoffman, No. 95 C 1401, 1995 U.S. Dist. LEXIS 15777,
at *10-12 (N.D.Ill. Oct. 20, 1995). See also Delano-Pyle v.
Victoria County, Tex., 302 F.3d 567, 574-75 (5th Cir.
2002); Duvall v. County of Kitsap, 260 F.3d 1124, 1141 (9th Cir.
2001); Rosen v. Montgomery County Md., 121 F.3d 154, 157 n.3 (4th
Cir. 1997). Cf. Amnesty Am. v. Town of W. Hartford, 361 F.3d 113,
126 (2d Cir. 2004).

Defendants, however, have not supported Gloskin's position with any medical evidence. The mere existence of "possible" avenues of transmission, presented "without a documented showing," "does not create a genuine issue of material fact as to direct threat." Abbott v. Bragdon, 163 F.3d 87, 90 (1st Cir. 1998). Accord Chalk v. U.S. Dist. Court, 840 F.2d 701, 707-09 (9th Cir. 1988); N.Y. State Ass'n of Retarded Children v. Carey, 612 F.2d 644, 650 (2d Cir. 1979).

Moreover, Gloskin, as a registered nurse, had her own duty to evaluate the risk.[48] A health professional has a "duty to assess the risk of infection based on the objective, scientific information available[49] to [her]" and, accordingly, her "belief that a significant risk existed, even if maintained in good faith, w[ill] not relieve [DMDC] of liability." Bragdon, 524 U.S. at 649. Thus, Gloskin's own "state of mind [does not] excuse discrimination without regard to the objective reasonableness of [her] actions." Id. at 650.

_____

[48] Gloskin even expressed doubts as to Levy's alleged suggestion that HIV was transmissible in a swimming pool, but she nonetheless went with what he said. (Pl.'s Ex. E, Ellen Gloskin Dep. 90.) Neither Gloskin nor the Katz sisters did any additional research to confirm Levy's opinion. (Pl.'s Ex. C., Roberta Katz Dep. 100.)

[49] In Bragdon, the Supreme Court approved of the circuit court's refusal to consider medical evidence unavailable to the defendant when he made his decision. Bragdon, 524 U.S. at 650. However, Defendants do not argue that medical evidence was not available to them, but rather argue that they did not have sufficient time to review it.

Defendants also argue that Levy's advice constituted "objective" evidence on which they could rely. But Defendants are only partly correct. It is correct that a public accommodation can "consult with individual physicians as objective third-party experts." Bragdon, 524 U.S. at 649. But even assuming that Levy provided the advice ascribed to him by Defendants, Defendants have still failed to support the reasonableness of that advice with objective medical evidence sufficient to raise an issue of material fact. While "obtaining a physician's detailed assessment and then acting in accordance with it can be persuasive evidence that a [public accommodation] has based its decision on an individualized inquiry," such a public accommodation "cannot slavishly defer to a physician's opinion without first pausing to assess the objective reasonableness of the physician's conclusions." Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 31 (1st Cir. 2002) (citations omitted). See also Verzeni v. Potter, 109 F. App'x 485, 491-92 (3d Cir. 2004); Holiday v. City of Chattanooga, 206 F.3d 637, 645 (6th Cir. 2000). Nor should the court, in assessing the objective reasonableness of Defendants' actions, "defer to an individual doctor's opinion that is neither based on the individualized inquiry mandated by the ADA nor supported by objective scientific and medical evidence." Holiday, 206 F.3d at 645. Thus, Defendants' interpretation of their conversation with Levy, even if credited, does not provide a basis for contradicting the widespread,

41

established medical opinion applicable here.

That Defendants had less than a week to make their decision does not alter the court's conclusion. It is correct that, in certain circumstances, courts may apply a lower standard of reasonableness to a non-medically trained person with a very short time period in which to make a decision. See, e.g., Lockett, 496 F.3d at 1067 (determining a direct threat assessment made by a boat trip ticket seller to be reasonable and in good faith, given the ticket seller's limited time (i.e., close to the time of the boat's departure) to make the decision and his lack of health care training). But this is not such a case. Here, Defendants had several days to make their determination; Roberta Katz and Nurse Gloskin learned of Adam's HIV infection five or six days before the beginning of camp. (Pl.'s Ex. C., Roberta Katz Dep. 64-67, 69-70, 110; Defs.' Answers, Interrog. 17.) More important, however, as mentioned above, Gloskin had substantial medical training and experience with HIV.[50] In short, regardless of the fact that Gloskin had less than a week to assess Adam's condition, based on

---

[50] Defendants heavily rely on Doe v. Woodford County Bd. of Educ., 213 F.3d 921, 923 (6th Cir. 2000) (holding that no violation under ADA of rights of hemophiliac and Hepatitis B-positive junior varsity basketball player, as the school officials put player on "hold" for a little over a week to assess the existence of a direct threat). But Woodford County is not like the case at bar. The Woodford County plaintiff did not take issue with a decision of a health care professional deeming him a direct threat to others; rather, the plaintiff there sued the defendant on account of actions made by the defendant's employees with no medical training. See id. at 923-24, 926.

42

the record presented here, she should have known that Adam did not pose "significant" risks to other children.

The court agrees that Defendants were obligated to protect other campers from a very serious, life-threatening viral infection. But this obligation does not excuse Defendants' actions when based on unsubstantiated fears, Arline, 480 U.S. at 287, especially in the case of a decision partly made by a health care professional with both extensive experience with HIV and several days in which to confirm her medical opinions and educate other decision makers.

The court recognizes the inherent difficulties in this situation. Mrs. Doe, understandably concerned to protect her son from discrimination, was not forthcoming about his condition. It is more than unfortunate that Defendants -- faced with what they may have perceived as Mrs. Does' reticence -- may have felt that they lacked the specific information necessary to make a direct threat assessment. But, as a legal matter, Defendants' feelings cannot relieve them of their duty to base a threat determination on objective medical evidence. For these reasons, as to direct threat, the court GRANTS Plaintiff's Motion for Summary Judgment, and DENIES Defendants' Motion for Summary Judgment.

### IV. Adam's NYHRL Claim for Declaratory Relief

The elements of a *prima facie* case for ADA claims are also

applicable in claims under the NYHRL.[51] <u>Adams v. Master Carvers of Jamestown, Ltd.</u>, 91 F. App'x 718, 725 (2d Cir. 2004) (citing <u>Reeves v. Johnson Controls World Servs., Inc.</u>, 140 F.3d 144, 154-57 (2d Cir. 1998)). Therefore, insofar as Plaintiff has established his entitlement to summary judgment as to his ADA claim, he is also entitled to summary judgment under the NYHRL.

---

[51] The NYHRL's definition of "disability" is broader than that in the ADA. <u>See</u> <u>State Div. of Human Rights v. Xerox Corp.</u>, 480 N.E.2d 695, 698 (N.Y. 1985). Clearly, then, as HIV is a disability under the ADA, so too is it a disability under the NYHRL. <u>See</u> <u>Peters v. Baldwin Union Free Sch. Dist.</u>, 320 F.3d 164, 169 (2d Cir. 2003).

## VI. Conclusion

In light of the foregoing, the court hereby

1. DISMISSES Plaintiff's claim for injunctive relief; and

2. DISMISSES Defendants' defense of unclean hands; and

3. GRANTS Plaintiff's Motion for Summary Judgment of ADA and NYHRL declaratory relief, as to "disability" and "public accommodation"; and

4. GRANTS Plaintiff's Motion for Summary Judgment of ADA and NYHRL declaratory relief, as to DMDC's discrimination "on the basis of" Adam's disability; and

5. Otherwise DENIES Plaintiff's Motion for Summary Judgment; and

6. DENIES Defendants' Motion for Summary Judgment in its entirety.

The parties are directed to submit, by February 15, 2010, briefs regarding the liability of DMBA. The parties may each respond to the other's respective filings by March 1, 2010.

It is SO ORDERED.

Donald C. Pogue, Judge

Dated: January 13, 2010
      New York, New York